**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**TERRY KRAEMER**                                    **CIVIL ACTION**

**versus**                                                    **NO. 12-2523**

**N. BURL CAIN**                                          **SECTION: "J" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Terry Kraemer, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On December 9, 2005, he was convicted of two counts of

aggravated rape under Louisiana law involving two different victims.[1]  On January 13, 2006, he was sentenced on each count to a consecutive term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  The Louisiana First Circuit Court of Appeal affirmed those convictions and sentences on May 4, 2007.[3]  The Louisiana Supreme Court then denied a related writ application without assigning reasons on April 18, 2008.[4]

Petitioner thereafter filed with the state district court an application for post-conviction relief concerning both convictions[5] which was denied on August 27, 2011.[6]  Without reasons being assigned, petitioner's related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on December 5, 2011,[7] and by the Louisiana Supreme Court on August 22, 2012.[8]

---

[1] State Rec., Vol. V of VI, transcript of December 9, 2005, p. 113; State Rec., Vol. I of VI, minute entry dated December 9, 2005.

[2] State Rec., Vol. I of VI, minute entry dated January 13, 2006.

[3] State v. Kraemer, No. 2006 KA 2120 (La. App. 1st Cir. May 4, 2007); Rec. Doc. 3-1, pp. 1-19; State v. Kraemer, No. 2006 KA 2121 (La. App. 1st Cir. May 4, 2007); State Rec., Vol. VI of VI.

[4] State ex rel. Kraemer v. State, 978 So.2d 342 (La. 2008) (No. 2007-KH-1445); State Rec., Vol. I of VI.

[5] State Rec., Vol. II of VI.

[6] State Rec., Vol. II of VI, Judgment and Reasons for Judgment dated August 27, 2011.

[7] State v. Kraemer, No. 2011 KW 1728 (La. App. 1st Cir. Dec. 5, 2011); State Rec., Vol. II of VI.

[8] State ex rel. Kraemer v. State, 97 So.3d 351 (La. 2012) (No. 2011-KH-2801); State Rec., Vol. II of VI.

On or about October 1, 2012, petitioner filed the instant federal application for *habeas corpus* relief.[9]   It is unclear from his petition whether he is challenging both of his convictions in this federal proceeding, although from the discussion in his accompanying memorandum it appears that he is.  In its response in this proceeding, the state appears to interpret the petition as challenging both convictions.  Out of an abundance of caution, this Court will do the same.

Because the state concedes that petitioner's federal application was timely filed and that he exhausted his remedies in the state courts,[10] the Court will address his claims on the merits.

I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28

---

[9] Rec. Doc. 3.

[10]  Rec. Doc. 8, p. 8.

U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application

for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a

determination of a factual issue made by a State court shall be presumed to be correct.  The applicant

shall have the burden of rebutting the presumption of correctness by clear and convincing

evidence.").

       As to pure questions of law and mixed questions of law and fact, a federal court must

defer to the state court's decision on the merits of such a claim unless that decision "was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary

to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535

U.S. at 694.

       Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals

has explained:

> A state court decision is contrary to clearly established precedent if
> the state court applies a rule that contradicts the governing law set
> forth in the [United States] Supreme Court's cases.  A state-court
> decision will also be contrary to clearly established precedent if the
> state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme
> Court and nevertheless arrives at a result different from [United
> States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets,

and footnotes omitted).

       Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

–  4  –

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), cert. denied, 132 S.Ct. 1537 (2012).

## II.  Facts

On direct appeal in Case Number 2006 KA 2020, the Louisiana First Circuit Court of Appeal summarized the facts of that case as follows:

> In or around May of 2004, the defendant brought K.M. (the female victim herein) and J.R. (the female victim in 2006 KA 2121) to a room in the Holiday Motel in Houma, Louisiana.[FN3]  The girls' families were closely acquainted. On the date in question, the girls' parents entrusted the girls in defendant's care. According to K.M., the defendant instructed her to remove her clothing. When she did not comply, the defendant lowered K.M.'s shorts and underwear below her knees. The defendant had vaginal, anal, and oral sex with K.M.  J.R. witnessed the incident.  K.M. testified that the defendant

"licked [her] private part, ... sticked (sic) his private part in [her] private," and told her to "suck his private part."

> [FN3] K.M. and J.R. were ten years of age at the time of the instant offense. K.M.'s date of birth is August 6, 1994 and J.R.'s date of birth is September 22, 1994. The victims are identified herein only by their initials. See La. R.S. 46:1844(W).[11]

On direct appeal in Case Number 2006 KA 2021, the Louisiana First Circuit Court of Appeal summarized the facts of that case as follows:

> J.R., the victim herein, was eleven years old at the time of trial, Dec. 5, 2005.[FN3] J.R. testified to several instances of abuse by the defendant. The defendant was a friend of J.R.'s mother, Angel, and lived in their Houma, Louisiana household for a brief period of time from late 2000 to early 2001.[FN4] The first incident recalled by J.R. occurred at night in her bedroom. J.R. testified that she was "probably in Head Start" at the time of the offense. J.R.'s family was asleep at the time. J.R. was lying on her back with her nightclothes on. The defendant instructed her to remove her clothing and she complied. During her trial testimony, J.R. specifically stated, "[h]e put his penis in my vagina." J.R. testified that the sexual contact with the defendant was ongoing.

> > [FN3] J.R.'s date of birth is September 22, 1994. The victim is identified herein only by her initials. See La. R.S. 46:1844(W).

> > [FN4] The parents of K.M. (the juvenile victim in 2006 KA 2120) also lived in this household for several weeks during the same time period and K.M. and her sibling, who lived with their grandmother, stayed there on weekends. K.M.'s date of birth is August 6, 1994. She will also be identified herein by her initials only. See La. R.S. 46:1844(W).

---

[11] State v. Kraemer, No. 2006 KA 2120, at pp. 2-3 (La. App. 1st Cir. May 4, 2007); Rec. Doc. 3-1, pp. 2-3.

J.R. ultimately informed her mother of the abuse.[FN5]  On January 29, 2001, Angel contacted the police.  Detective Garry Tullis of the Lafourche Parish Sheriff's Office investigated the complaint.[FN6]   According to Detective Tullis, J.R. neither disclosed anything to the police nor denied that something had happened; and therefore, the case was closed for lack of probable cause.  The defendant did not communicate with J.R. or her family for approximately two years.

> [FN5]  According to Angel, J.R. initially reported the abuse to a counselor and the counselor informed Angel.  At the time of trial, J.R. did not remember discussing the abuse with a counselor.

> [FN6]  Detective Tullis had previously investigated a complaint against the victim's father, who was charged with the aggravated rape of J.R. and pled guilty to forcible rape.  At the time of this trial, he was incarcerated for this crime.

In December of 2003, the defendant and Angel rekindled their friendship.  The defendant resumed spending time with Angel and her children.  During a videotaped interview and in her trial testimony, J.R. discussed several instances of sexual abuse that occurred after December 2003, at several different locations, including the Holiday Motel in Houma, Louisiana, the home of Tiffany Burnett (the defendant's girlfriend) in Thibodaux, Louisiana, and the Holiday Inn in Houma, Louisiana.  Sometime near Mardi Gras (presumably in 2004), an incident of abuse specifically detailed by the victim occurred in the back of Angel's vehicle.

Another incident occurred when the victim, her family, and the defendant stayed at Donald Rupert's residence for a brief period of time.  During this incident, the defendant and J.R. were sleeping on an air mattress, and J.R. testified that "[h]e put his penis in [her] vagina ... [a]nd [she] bled that time."

J.R. testified that the defendant took her to the holiday Motel in Houma, Louisiana "about two or three times."  She further testified that she stayed overnight at the motel with the defendant on those occasions and he "did the same thing I told you, like put his penis in my vagina."  During one of those occasions at the Holiday Motel, J.R. witnessed the defendant's sexual abuse of K.M.  Both girls were ten years old at that time.  As the defendant abused K.M., he

– 7 –

instructed J.R. to position herself behind him and to pinch his nipples. The facts of that incident form the basis of the charge and conviction in 2006 KA 2120, also handed down this date.[12]

### III.  Petitioner's Claims

### A.  Sufficiency of the Evidence

Petitioner first claims that the trial court erred in failing to grant his motion for post verdict judgment of acquittal and motion for new trial on the grounds that there was insufficient evidence to support his convictions.

In the last reasoned state court judgment addressing the claim challenging the sufficiency of the evidence to support the conviction for the aggravated rape of K.M., the Louisiana First Circuit Court of Appeal denied that claim, holding:

> In his first assignment of error, the defendant argues that the trial court erred in denying his motion for post verdict judgment of acquittal and motion for new trial on the basis that the evidence was insufficient to support the verdict.  The defendant argues that the verdict was solely based on the testimony of the victims, which he argues was incredible.  The defendant contends that the victims were more likely recalling prior incidents of abuse by J.R.'s biological father instead of any abuse by the defendant.  The defendant contends that the victims' separate accounts of the alleged incidents of abuse by the defendant were inconsistent, and that the victims' testimonies were inconsistent with their prior statements.  Finally, defendant contends that both victims had faulty memories.
>
> The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and adopted by the Legislature in enacting La. C.Cr.P. art. 821, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the

---

[12] State v. Kraemer, No. 2006 KA 2121, at pp. 2-4 (La. App. 1st Cir. May 4, 2007); State Rec., Vol. VI of VI.

essential elements of the crime beyond a reasonable doubt.  The Jackson standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the trier of fact must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence.  State v. Graham, 2002-1492, p. 5 (La. App. 1st Cir. 2/14/03), 845 So.2d 416, 420. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis fails, and the defendant is guilty unless there is another hypothesis, which raises a reasonable doubt.  State v. Captville, 448 So.2d 676, 680 (La. 1984).

In order to support a conviction of aggravated rape, the State was required to prove beyond a reasonable doubt that defendant had oral, vaginal, or anal sexual intercourse with a victim who was under thirteen years of age.  La. R.S. 14:42(A)(4).  "[A]ny sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime."  La. R.S. 14:41(B).  Any penetration, however slight, of the aperture of the female genitalia, even its external features, is sufficient sexual penetration.  State v. Ross, 2003-0564, p. 11 (La. App. 3rd Cir. 12/17/03), 861 So.2d 888, 895, writ denied, 2004-0376 (La. 6/25/04), 876 So.2d 829 (quoting State v. Bertrand, 461 So.2d 1159, 1161 (La. App. 3rd Cir. 1984), writ denied, 464 So.2d 314 (La. 1985)).  The testimony of the victim alone is sufficient to prove the elements of the offense.  State v. Orgeron, 512 So.2d 467, 469 (La. App. 1st Cir. 1987), writ denied, 519 So.2d 113 (La. 1988).

The trial began on December 5, 2005.  According to the lead investigator of the case, Terrebonne Parish Sheriff's Detective Sheila Guidry, the complaint regarding the instant offense was initially reported by K.M.'s maternal grandmother, Patricia.  During her trial testimony, Patricia indicated that K.M. was in special-education classes.  K.M. initially told her sister about the incident and K.M.'s sister told Patricia.  Patricia confronted K.M., and K.M. gave her specific details of the incident.  Patricia was aware of prior abuse of K.M. by J.R.'s father; however, she stated that K.M. never discussed the details of that incident with her.  When questioned  as to whether K.M. could have been confusing the two incidents, Patricia responded negatively and explained that K.M. specifically named and described the defendant as the perpetrator of the more recent incident and that she "was not confused one bit."  Patricia estimated that the abuse of K.M. by J.R.'s father took place when K.M. was between 3

½ to six years old, while the instant offense took place when K.M. was ten years old.

State witness Detective Dawn Buquet, a forensic interviewer and investigator at the Children's Advocacy Center, conducted videotaped interviews of K.M. and J.R. The interview of K.M. took place on September 21, 2004. During the videotaped interview of K.M., she described the defendant as a friend of J.R.'s mother, Angel. K.M. stated that on the date in question, the defendant took her and J.R. to the Holiday Motel. K.M. stated that the incident occurred in the summer (in or near that May), just after she completed the third grade. According to K.M., they arrived at the motel room at around 7:00 p.m. K.M. specified that the defendant told her to bend over, pushed her body down, and "put his thing in [her] front and back." The defendant was positioned behind K.M. as she held onto the bed. She further stated that the defendant told her to "suck" his private part and that the defendant "licked me." She specified that the defendant instructed her to open her mouth and then he "slid it in" her mouth. She stated that the defendant referred to his "private" as a "bird." K.M. stated that the defendant "made" her participate in these acts and told her not to tell anyone. K.M. did not see the defendant touch J.R. during this incident and stated that J.R. watched as these acts took place. She stated that the defendant took J.R. with him into the bathroom at some point and the door was closed. She could provide no details as to what happened when the defendant took J.R. to the bathroom. According to K.M., they left the motel room around 10:00 p.m. K.M. stated that she initially did not tell anyone about the incident because the defendant was a friend of her mother, Shawn, but later she told her grandmother and her sister. K.M. described the defendant as bald, with no tattoos, and as having scars on his face (specifying, "I think by his nose and the back of his head"). She also stated that the defendant wore a silver watch.

During her trial testimony, K.M. stated that date of birth was August 6, 1994. K.M. was eleven years old at the time of the trial. K.M. was in the fourth grade at the time of the trial, but had previously failed the first and fourth grades. According to K.M., just prior to the offense she was at the shopping mall where her mother, Shawn, was working. At Shawn's request, the defendant picked K.M. up from the mall. K.M. testified that the defendant told her to sit on his lap and "[h]e wanted us to try to kiss him with the tongue, but I didn't want to." K.M.'s testimony further consisted of a factual account of the sexual acts that took place during the incident in question that was consistent with the account provided during her

interview with Detective Buquet.  She responded positively when asked whether it hurt when the defendant "stuck his private part in [her] private."

K.M. was questioned regarding any prior abuse.  She confirmed that J.R.'s father had abused her.  K.M. could not remember how old she was when the incident took place, but responded positively when asked whether it occurred years before the trial.  K.M. testified that J.R.'s father touched her private part with "[j]ust his hands."  She responded negatively when specifically asked whether he ever put his private part in her private part.

During cross-examination, K.M. stated that she delayed telling someone about the incident because she was "scared."  She stated that she did not know why she didn't scream during the incident.  According to K.M.'s testimony, she had never met the defendant before the incident in question.  She stated that she went bowling with the defendant and J.R. "[a] few days" after the incident.  She testified that she did not have any contact with the defendant after the bowling event.

During the videotaped interview of J.R., she stated that her mother, Angel, had rented the motel room for the defendant.  She stated that when they first arrived at the room they played for a while, and "then, something happened to [K.M.]."  The defendant told K.M. to take her clothes off and she "had to put her mouth on his penis."  She stated that both K.M. and the defendant were on their knees.  She further stated that the defendant sat on the bed as K.M. kneeled on the bed.  The defendant instructed J.R. to position herself behind the defendant, put her hands around his upper body and pinch his chest.  She stated that the defendant kissed K.M. on the mouth.  The defendant then told K.M. to lie on the bed.  As K.M. lay on the bed with her legs dangling, the defendant "got on his knees and put his mouth on [K.M.'s] front middle spot and was licking."  According to J.R., the defendant did not commit any other sexual acts with her on the date in question.  She stated that she was afraid to tell anyone what happened to K.M. and she also believed that it was her fault that it happened.

J.R. testified that the defendant lived with her family at some point.  She recalled that K.M. and her family also lived with her family while the defendant lived there.  J.R. could not remember how old she was when she first met the defendant.  She merely specified that the defendant came to live in her household "[l]ike when I was little."  She stated that the defendant lived in her household for an unknown period of time, left for an unknown period of time

("probably two or three months"), and then came back.  She testified that her father "put his penis in [her] vagina" when she was younger.  J.R. met the defendant after her father was incarcerated.  Someone that she referred to only as "Peanut" also abused J.R.   J.R. specifically stated that Peanut, "touched [her] in another kind of way with his hands."  When asked whether anyone else ever touched her in a sexual way, she responded, "Terry Kraemer did."  She recounted several incidents of sexual abuse by the defendant.  J.R.'s trial testimony regarding the instant offense was essentially the same as the factual account presented during the videotaped interview conducted by Detective Buquet.

On October 19, 2004, Dr. Ellie Wetsman, an expert in the field of pediatric medicine, examined K.M.  Before conducting a full physical examination, Dr. Wetsman interviewed K.M.   K.M. informed Dr. Wetsman, "I got raped from somebody."  She detailed the incident and named the defendant, "Terry," as the person who took her to "his hotel, a Holiday Inn."  She stated that the defendant was trying to make her remember his name.  She stated that "[h]e put his thing in the front and the back.  My front private part and my butt."  When asked whether there was anything the defendant made her do, she stated, "[h]e made me suck it."  When asked whether it hurt she said, "[f]rom his thing."  Dr. Wetsman asked K.M. questions regarding what the defendant did with his hand, and she said, "[h]e touched me down there."  K.M. further informed Dr. Wetsman that J.R. witnessed the acts.  K.M. stated that after the incident, it burned when she urinated and she had some irritation in her genital area.  K.M. also informed Dr. Wetsman of a previous incident with a different perpetrator.

During the physical examination, K.M.'s genital and anal areas were examined with an instrument called a colposcope.  The results were normal.  The physical examination did not confirm or dispel the possibility of penetration.  Dr. Wetsman noted that K.M.'s hymen had the effects of hormone estrogen.[FN4]  She explained, that once a little girl has gone through puberty, her ovaries secrete the hormone estrogen that thickens and causes her hymen to increase in elasticity.  Dr. Wetsman stated that the hymen does not necessarily change after penetration.  She added that it was "virtually impossible" to tell whether a girl has been penetrated or not.  She stated that physical findings are rare and that injuries to the hymen heal quickly. On cross-examination, Dr. Wetsman confirmed that the first instance of sexual intercourse does not always cause pain or bleeding.  On re-direct examination, Dr. Wetsman confirmed that

physical findings are more likely to exist when the examination is conducted in close proximity to the incident of abuse and even then are more often not found.

> [FN4]  Dr. Wetsman defined hymen as "a portion of tissue that separates the vagina from the outside."

Dana Davis, a clinical social worker and psychotherapist who counseled K.M. and J.R., testified as an expert in the field of counseling and clinical therapy.  Davis stated that the two girls had never been counseled together and diligent steps had been taken to keep the girls separate.  Davis testified that children commonly delay discussing traumatic events for a number of reasons including fear of the perpetrator or that they will be blamed for the incident.  Other reasons for "delayed disclosure" include embarrassment or to protect someone.  She confirmed that children often feel affectionate toward perpetrators of abuse, noting that perpetrators often spend a long time building a relationship with the children and making them feel special.  Davis also explained that children have a limited ability to understand time and space, noting that they may say "a long time ago" to describe something that happened a week before such description.  She also stated that children sometimes minimize the seriousness of trauma.

Davis's first session with K.M. took place on September 28, 2004, and the last visit before the trial took place December 1, 2005.  Davis described K.M. as shy and withdrawn and noted that she had been diagnosed with post-traumatic stress disorder (PTSD).[FN5] During cross-examination, Davis confirmed that the symptoms noted in K.M.'s behavior and affect were associated with the PTSD diagnosis.

> [FN5]   K.M.'s symptoms included depression, anxiety, disorganized behavior in thinking, blunting of affect or flattening of affect or emotion, hyper-vigilance (being over concerned about environmental occurrences), sleep disruption, and diminished performance in school.

Defense witnesses, Robert Billiot, Jr. (the defendant's cousin), Terry Kraemer, Sr. (the defendant's father), Stacy Verdin (the defendant's friend), and the defendant's two minor sons testified

that they never observed any inappropriate behavior by the defendant regarding children.

Robert Billiot had a seven-year-old daughter at the time of the trial. The defendant lived with Billiot for about six months and would occasionally take care of his daughter. Billiot's daughter was about six months old at the time. Billiot stated that he would still trust the defendant to take care of his daughter.

Stacy Verdin met the defendant at a local club. They exchanged telephone numbers and became friends. Verdin had two children at the time of the trial, a daughter and a son. She testified that her daughter was two years old when she met the defendant. She further testified that, although her daughter would rarely feel comfortable with outsiders, "for some reason she just took up with him. She really looked up to him." Verdin stated that she still trusts the defendant with her kids.

Defense witness Tiffany Burnett, the defendant's girlfriend, met the defendant in February of 2004, one night when she was out with friends. She was present and recalled a bowling event with the defendant, K.M., and J.R. Tiffany testified that K.M. did not appear to be afraid of the defendant and that the group joked and laughed. Angel eventually joined them. When they left the bowling alley, the girls chose to ride home with the defendant and Tiffany. Tiffany testified that she and the defendant never had sexual intercourse. Although they had tried several times, the defendant was never able to obtain a full erection, so they ultimately stopped trying to have intercourse. Tiffany had observed the defendant around children on several occasions and never saw him do anything inappropriate with the children.

Tiffany rented a room at the Holiday Motel for the defendant several times. She stated that the rooms were often registered in her name. She stated that the first time she rented a room for him, he was looking for a job and did not have money to rent a room. Tiffany lived with her mother in Thibodaux. She and the defendant would often rent a room when they would "go out" and "drink" in Houma. The Holiday Motel was across the street from an establishment that they frequented. She confirmed that the defendant would often baby-sit J.R. and J.R.'s brother, D.R. During cross-examination she confirmed that the defendant was alone with J.R. in the motel room on occasion.

Defense witness, Angel, had two children at the time of the trial, J.R. and D.R. Angel testified that her children's father, her ex-husband, "raped" J.R. and K.M. J.R. informed Angel that her father

began abusing her when she started dancing at about two years of age.  The abuse was discovered when J.R. was approximately five years of age.  J.R. did not provide her mother with details regarding the abuse.  Angel stated that she had a conversation with K.M. at some point wherein K.M. stated what J.R.'s father did to her "what he did to [J.R.]," adding that "[h]e put his privates in hers." According to Angel, J.R.'s father was sentenced to forty years imprisonment.

Angel met the defendant in a barroom around September of 2000, and they developed a friendship.  The defendant moved in with Angel around October of 2000.  Angel stated that their relationship was not romantic although they "slept together" once prior to the defendant moving in with her.  The defendant lived with Angel and her children until January of 2001.  In October of 2000, the defendant, Shawn, and her ex-husband lived with Angel and her children in their trailer.  Shawn's children, including K.M., stayed in the trailer on weekends.   Shawn's children stayed with their grandmother, Patricia, during the week.  Shawn lived with Angel for several weeks.  Thus, K.M. had common living arrangements with the defendant for several weekends in the year 2000.  Angel never saw the defendant do anything inappropriate with K.M. or J.R.

In January of 2001, during a counseling session, J.R. made an allegation of sexual abuse by the defendant, but later recanted.  Angel reported the allegation to the police.  Detective Gary Tullis of the Lafourche Parish Sheriff's Office investigated the complaint.[FN6] According to Detective Tullis, J.R. did not disclose anything to the police, but also did not deny that something happened.  The case was closed for lack of probable cause.  The defendant moved out and Angel did not see him again until December of 2003, when she saw him one night at a bar.  Angel and the defendant decided that they needed to talk to each other and left the bar.  That same evening, J.R. was awake when Angel arrived home.  Angel asked J.R. if anyone had been touching her and J.R. responded negatively.  She stated, "[a]nd for some reason she brought Terry up that night.  She said that [defendant] hadn't done her anything; that Peanut had tried to touch her."  The next day Angel asked J.R. if she was certain about the statements she made the night before.  J.R. responded positively. Angel informed J.R. that she saw the defendant, and J.R. stated that she also wanted to see the defendant.  The family rekindled their relationship with the defendant.  She testified that she and the defendant became the "best of friends."  She stated that she and her children could depend on the defendant and that he would baby-sit

for her at times.  The defendant stayed at the Holiday Motel in 2003 near the week of Christmas and continued to stay there periodically. The defendant often kept J.R. and D.R. at his motel room during the time period from December of 2003 to September of 2004.  Angel would sometimes pay for the room.

> [FN6]    Detective Tullis also investigated the complaint against J.R.'s father.  J.R.'s father was charged with the aggravated rape of J.R. and pled guilty to forcible rape.

Angel remembered the incident in question, that is, when the defendant also brought K.M., along with J.R., to his room.  She estimated that the incident took place in May of 2004.  That day, the defendant had dropped Angel off at her place of employment and took her children to his motel room.  D.R. asked if he could go to work with Angel, and she allowed the defendant to bring him to her workplace.  Shawn called as the defendant and J.R. were on their way back to the motel.  Shawn needed someone to watch K.M. and Angel suggested she call the defendant.  The defendant picked up K.M. and brought both girls to his motel room.  According to Angel, she spoke with the defendant numerous times while he was at the motel.  She stated that she could hear the girls in the background and that they sounded like they were having fun.  She heard the girls complaining about leaving when the defendant told them it was time to go.  She stated that both girls seemed happy later that night.  K.M. did not appear to be afraid of the defendant or in pain.  Angel testified that the allegations against defendant made by K.M. and J.R. as to the day in question were similar to their allegations against J.R.'s father.  She stated that just after J.R.'s father went to prison, K.M. told her that he had sex with her in J.R.'s room on J.R.'s bed and that J.R. watched. J.R.'s father then went into the bathroom with J.R.

During cross-examination, Angel confirmed that the defendant had a bad temper and that she was afraid of him at times. She also stated that J.R. might have also been afraid of the defendant at times.[FN7]

> [FN7]  While it was not specified as to what incidents the charges stemmed from, Angel was charged with principal to aggravated rape and criminal obstruction. The aggravated rape charge was dropped while the other charge was pending at the time of the trial.  The

record is unclear as to whether the criminal
obstruction charge is related to the instant case.
Angel's credibility was impeached during cross-
examination after she was questioned regarding her
purchase of a vibrator for J.R.  According to Angel,
she purchased the vibrator for J.R. as a last resort
when J.R. was acting out sexually in ways that
included masturbating with a toy.  Angel did not want
J.R. to hurt herself.  In a statement to Detective
Buquet, Angel stated that she had gotten rid of
vibrators that she had purchased for herself and for
J.R.  However, the vibrators were later confiscated
from Angel's mother's house.

Consistent with Angel's testimony, the defendant testified that
he met Angel in 2000 at a nightclub and they had a "one night stand."
The defendant began staying in a motel room when he was working
offshore on Torch barges for ABC Welders.  The defendant had
nowhere to go in between work shifts.  The defendant confirmed that
he stayed with Angel at the end of 2000 and the beginning of 2001,
along with K.M.'s parents (with K.M. and her siblings staying with
them on the weekends).  After getting injured on the job, the
defendant would stay with Angel's children while she worked.
During the approximate three-month period between late 2000 and
early 2001, the defendant saw K.M. during four to six visits.  The
defendant became aware of J.R.'s prior abuse by her father after he
witnessed an inappropriate incident with J.R. and K.M.'s brother.
According to the defendant, the two children were bouncing on the
bed and the defendant left the room.  When he returned, J.R. was
under a blanket.  The defendant pulled back the blanket and
discovered that J.R.'s outer clothing had been removed.  The
defendant discussed the incident with Angel and she informed the
defendant of J.R.'s history of abuse.

The police questioned the defendant in January of 2001, as to
whether he had any sexual contact with J.R.  The defendant denied
any sexual contact with J.R. and stopped answering questions when
they became repetitive.  The defendant temporarily moved to
Sulphur, Louisiana, to work with his father.  He informed the police
of his forwarding address.

After the defendant and Angel resumed their friendship, the
defendant had Angel's children with him "on a regular basis on
weekends."  Regarding the incident in question, the defendant

confirmed that he brought K.M. and J.R. to his motel room in early May of 2004.  The defendant stated that he was alone with the girls in his room for approximately thirty to forty-five minutes.  The defendant stated that he never touch either girl inappropriately.  The defendant did not wear a watch, but did have two scars on his face below his eyes.

During cross-examination, the defendant stated that the incident where J.R.'s outer clothes were removed while she was in the room with K.M.'s brother was the only inappropriate incident he witnessed.  The State impeached the defendant by quoting his prior statements to OCS in January 2001, in which the defendant stated, "one morning [J.R.] ... woke [him] up because she was jacking [him] off."  The defendant testified that the incident did occur but it "slipped [his] mind."  The defendant responded positively when asked whether he carried a sexual lubricant with him during the time he dated Tiffany.  When asked whether he had a sexual relationship with Tiffany, the defendant stated that they "[t]ried, but we didn't, couldn't."

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness.  Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of weight of the evidence, not its sufficiency.  The trier of fact's determination of the weight to be given evidence is not subject to appellate review.  An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt.  State v. Taylor, 97-2261, pp. 5-6 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932.  We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases.  See State v. Mitchell, 99-3342, p. 8 (La. 10/17/00), 772 So.2d 78, 83 (quoting State v. Azema, 633 So.2d 7[23], 727 (La. App 1st Cir. 1993), writ denied, 91-0141 (La. 4/29/94), 637 So.2d 460)).

Although the defendant argues that the victims are confusing him with their prior abuser, J.R.'s father, the defendant does not deny bringing the girls to the motel room at the time of the incident in question.  The defendant also confirmed that he was alone with the girls in the motel room.  The defendant, however, denies the facts presented by the victims as to what occurred in the room.  The defendant argues that the verdict is irrational and that the victims' testimonies were incredible and inconsistent.  We disagree.  The defendant notes, in part, that K.M. did not state during her interview with Detective Buquet that the defendant tried to kiss her but testified

as such.  The defendant further notes that K.M. told Dr. Wetsman that the defendant touched her with his hand, but did not inform anyone else of this.   The defendant further notes that K.M. knew the defendant (specifying that K.M. lived with the defendant for a "few months" in 2000 and 2001) before the incident in question, although she testified otherwise.  We find the defendant's efforts to undermine the victim's credibility unconvincing.  We find it insignificant that K.M. may have failed to consistently reiterate such minor details when she consistently recounted heinous details of vaginal, anal, and oral intercourse.  We find that K.M.'s separate accounts of the incident in question were wholly consistent.  Furthermore, K.M.'s factual accounts of the incident were consistent with the accounts presented by J.R.  We also find it insignificant that the youthful victim may not have recalled knowing the defendant years before the incident in question, although she apparently spent several weekends in the same household with the defendant in late 2000 to early 2001. K.M. was only six years old at that time.  It is not inconceivable that she would not recall knowing the defendant or sleeping in the same household with him on weekends only during a very brief period of her life.

Both victims convincingly indicated that defendant committed the more recent incident of abuse at issue.  The jury was reasonable in rejecting the defendant's hypothesis of innocence.  After a thorough review of the record, viewing the evidence in the light most favorable to the State, we are convinced that any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendant was guilty of the aggravated rape of K.M.  This assignment of error is without merit.[13]

In the last reasoned state court judgment addressing the claim challenging the sufficiency of the evidence to support the conviction for the aggravated rape of J.R., the Louisiana First Circuit Court of Appeal similarly denied that claim, holding:

In his first assignment of error, the defendant argues that the trial court erred in denying his motion for post verdict judgment of

---

[13]   State v. Kraemer, No. 2006 KA 2120, at pp. 3-16 (La. App. 1st Cir. May 4, 2007); Rec. Doc. 3-1, pp. 3-16.

acquittal and motion for new trial on the basis that the evidence was insufficient to support the verdict. The defendant argues that the verdict was solely based on the testimony of the victims, which he argues was incredible. The defendant contends that the victims were more likely recalling prior incidents of abuse by J.R.'s biological father instead of any abuse by the defendant. The defendant contends that the victims' separate accounts of the alleged incidents of abuse by the defendant were inconsistent and that the victims' testimonies were inconsistent with their prior statements. Finally, defendant contends that both victims had faulty memories.

The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and adopted by the Legislature in enacting La. C.Cr.P. art. 821, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. The Jackson standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the trier of fact must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. Graham, 2002-1492, p. 5 (La. App. 1st Cir. 2/14/03), 845 So.2d 416, 420. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis fails, and the defendant is guilty unless there is another hypothesis, which raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La. 1984).

In order to support a conviction of aggravated rape, the State was required to prove beyond a reasonable doubt that defendant had oral, vaginal, or anal sexual intercourse with a victim who was under thirteen years of age. La. R.S. 14:42(A)(4).[FN7] "[A]ny penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La. R.S. 14:41(B). Any penetration, however slight, of the aperture of the female genitalia, even its external features, is sufficient sexual penetration. State v. Ross, 2003-0564, p. 11 (La. App. 3rd Cir. 12/17/03), 861 So.2d 888,895, writ denied, 2004-0376 (La. 6/25/04), 876 So.2d 829 (quoting State v. Bertrand, 461 So.2d 1159, 1161 (La. App. 3rd Cir. 1984), writ denied, 464 So.2d 314 (La. 1985)). The testimony of the victim alone is sufficient to prove the elements of

the offense.  State v. Orgeron, 512 So.2d 467, 469 (La. App. 1st Cir. 1987), writ denied, 519 So.2d 113 (La. 1988).

> [FN7]  The instant offense against J.R. was charged with a time period between 1999 and June 2004 for the date of commission.  During that time period, La. R.S. 14:41 and La. R.S. 14:42 were amended to add "oral" (2001 La. Acts No. 301, § 1) and the age element of La. R.S. 14:42 was increased from twelve to thirteen years of age (2003 La. Acts No. 795, § 1).

The trial began on December 5, 2005.  Lead investigator of the case, Terrebonne Parish Sheriff's Detective Sheila Guidry, began investigating the defendant after a report by K.M.'s maternal grandmother (Patricia).  Detective Guidry collected several Holiday Motel receipts from April 2004 to June 2004, evidencing room rentals by the defendant and his girlfriend, Tiffany Burnett. Specifically, the receipts are dated as follows:  April 7th to April 12th, April 14th to April 15th and (on the same receipt) April 18th to April 22nd, April 23rd to April 29th, May 10th, May 27th to May 28th, June 16th, and June 19th.  The room was registered in the defendant's name on May 10th.  The rooms were registered in Tiffany's name for the rest of the dates.

State witness Detective Dawn Buquet, a forensic interviewer and investigator at the Children's Advocacy Center, conducted videotaped interviews of K.M. and J.R.  The interview of K.M. took place on September 21, 2004.  During the videotaped interview of K.M., she described the defendant as a friend of J.R.'s mother, Angel. K.M. stated that the defendant took her and J.R. to the Holiday Motel.  K.M. stated that the incident occurred in the summer, just after she completed the third grade.  According to K.M., she, the defendant, and J.R. arrived at the motel room at around 7:00 p.m. K.M. specified that the defendant told her to bend over, pushed her body down, and "put his thing in [her] front and back."   The defendant was positioned behind K.M. as she held onto the bed.  She further stated that the defendant told her to "suck" his private part and that the defendant "licked me."  She specified that the defendant instructed her to open her mouth and then he "slid it in" her mouth. She stated that the defendant referred to his "private" as a "bird." K.M. stated that the defendant "made" her participate in these acts and told her not to tell anyone.  K.M. did not see the defendant touch J.R. during this incident and stated that J.R. watched as these acts

took place.  She stated that the defendant took J.R. with him into the bathroom at some point and the door was closed.  She could provide no details as to what happened when the defendant took J.R. to the bathroom.  According to K.M., they left the motel room around 10:00 p.m.  She stated that she initially did not tell anyone about the incident because the defendant was a friend of her mother, Shawn, but later she told her grandmother and her sister.  K.M. described the defendant as bald, with no tattoos, and as having scars on his face, one by his nose and the other on the back of his head.  She also stated that the defendant wore a silver watch.

K.M.'s trial testimony was consistent with the statements provided during her interview with Detective Buquet.  She added that the defendant told her to sit on his lap and "[h]e wanted us to try to kiss him with the tongue, but I didn't want to."  She confirmed that she, too, had previously been abused by J.R.'s father.  K.M. could not remember how old she was when that incident took place, but responded positively when asked whether it occurred years before the trial.  K.M. testified that J.R.'s father touched her private part with "[j]ust his hands."  She responded negatively when specifically asked whether J.R.'s father ever put his private part in her private part.

The videotaped interview of J.R. took place on January 18th, 2005.  During the videotaped interview of J.R., she stated that the defendant and her mother were friends.  Regarding the incident involving both victims, J.R. stated that her mother had rented the motel room for the defendant.  When they first arrived at the room they played for a little while and "then, after that[,] something happened to [K.M.]."  The defendant told K.M. to take her clothes off and she "had to put [her] mouth on Terry's penis."  She stated that both K.M. and the defendant were on the ground, on their knees.  She further stated that the defendant sat on the bed as K.M. kneeled on the bed.  The defendant instructed J.R. to position herself behind the defendant, put her hands around his upper body and pinch his chest.  She stated that the defendant kissed K.M. on the mouth.  The defendant then told K.M. to lie on the bed.  K.M.'s legs were dangling off the bed.  The defendant "got on his knees and put his mouth on [K.M.'s] front middle spot and was licking."  According to J.R., the defendant did not commit any sexual acts with her on the date in question.  She stated that she was afraid to tell anyone what happened to K.M. because she believed that it was her fault that it happened, that she may get in trouble, and that maybe no one would believe her.

J.R. stated that the defendant "either licks [her] on [her] front or makes [her] [do] stuff." She further detailed that "he put his penis in [her] front middle spot and did that to K.M." She stated that the first incident of abuse by the defendant occurred when she was "about three" years old, in her bed at her residence in Houma. The defendant instructed her to get on the bed, pushed her arms on the bed, and "kept putting his penis in [her] front middle spot." She told him to stop and continued to cry. J.R. stated that she kept telling her mother about the abuse, but then decided to "take it back" and told her mother that it did not happen.

J.R. stated that the defendant made her have sex with him in several different rooms on different occasions at the Holiday Motel; "I'm guessing twenty" times. She stated that the defendant placed his penis in her "front," "back," and mouth, and that he licked her. She stated that the defendant once made her drink apple juice and "wine" which she said made her feel "gross" and forced her to swallow what the defendant referred to as "sex pills." She stated that the defendant put "oily stuff" on his penis and on her body each time before sex.

J.R. testified that during the 2004 school year while she was in the fourth grade, the defendant had sex with her at Tiffany's house in Thibodaux while Tiffany was at work. J.R. also stated that the defendant abused her more than once during a weekend stay at the Holiday Inn in Houma. She, her mother, her brother, the defendant, the defendant's mother, and several others were at the Holiday Inn on that occasion. According to J.R., everyone had gone outside to the pool when the defendant abused her. The incident also occurred during the 2004 school year.

J.R. described another incident of abuse when she, her mother, her brother, and the defendant stayed at a relative's house. J.R.'s mother slept on the sofa and J.R. slept with the defendant on an inflatable mattress, which she described as "normal." She stated that the defendant woke her up and made her have sex. This time he "made me bleed." The defendant told her to take a bath and he washed her underwear and shorts.

J.R. stated that she saw "white stuff" come out of the defendant's penis on more than one occasion. Because they slept together in the same bed all the time, she stated that the defendant did not own or wear underwear; he would sleep either in his pants or shorts. She ultimately divulged information to her mother, explaining that "it exploded out of me."

J.R. testified that the defendant lived with her family at some point. She noted that K.M. and her family also lived with J.R. while

the defendant lived there.  J.R. could not remember how old she was when she first met the defendant.  She merely specified that the defendant came to live in her household "[l]ike when I was little." She stated that the defendant lived in her household for an unknown period of time, left for an unknown period of time ("probably two or three months"), and then came back.  She testified that her biological father "put his penis in my vagina" when she was younger.  J.R. met the defendant after her father was incarcerated.  Someone that she referred to only as "Peanut" also abused her.  J.R. specifically stated that Peanut "touched [her] in another kind of way with his hands." When asked whether anyone else ever touched her in a sexual way, she responded, "Terry Kraemer did."  She recounted several incidents of sexual abuse by the defendant.  J.R. stated that the first incident of abuse by the defendant occurred when she was "probably in Head Start."  J.R.'s trial testimony regarding the incidents of abuse was essentially the same as the factual accounts presented during the videotaped interview conducted by Detective Buquet.

During her trial testimony, J.R. detailed an incident that took place in her mother's vehicle.  J.R. specifically testified that the defendant "[p]ut my mouth on his penis."  J.R.'s brother, D.R., approached the vehicle just after the act took place.  J.R. specified that the incident where she slept on an inflatable mattress with the defendant occurred when she, her family, and the defendant stayed at Donald Rupert's house for a few nights.  J.R. observed a brown mark on the defendant's penis during the first time period of abuse, before she made the initial complaint.  She did not recall seeing the mark during the second time period of abuse.  J.R. testified that her biological father did not have sex with her at the Holiday Motel or at Donald Rupert's house.  She confirmed that the incidents of abuse that took place at the Holiday Motel, Rupert's house, and the Holiday Inn were all by the defendant.

During cross-examination, J.R. confirmed that she met the defendant sometime after her father went to jail, which would have been July of 2000.  Thus, J.R. was nearly near six years of age when she met the defendant.  J.R. was also questioned regarding greeting cards that were mailed to the defendant before the trial, while he was in prison.  One card was signed, "I love you, [J.R.]."  J.R. was questioned regarding flashbacks that she had at school.  J.R. admitted that she faked flashbacks and seizures while in the third and fourth grade.  During re-direct examination, J.R. stated that her mother made her send the cards to the defendant and also made her fake the flashbacks and seizures.

Dr. Adrienne Atzemis, a forensic pediatrician at the New Orleans Children's Hospital and expert in pediatrics, examined J.R. on April 25, 2005.  During a pre-exam interview, J.R. detailed the incidents of abuse by the defendant.  J.R. was shown diagrams and asked to identify different body parts.  She initially referred to genitalia as a "middle spot" and then used the words "penis" and "vagina" when referring to the diagram.  According to Dr. Atzemis, J.R. talked about penile/vaginal, penile/oral, and penile/anal contact with the defendant.  J.R. also talked about the defendant touching her vagina with his hand.  She specifically named the Holiday Motel and her mother's vehicle as locations of the incidents of abuse by the defendant.  J.R. talked about blood coming from her vagina during a Holiday Motel incident.  J.R. also stated that she saw "white stuff" on the floor.  The defendant warned J.R. that if she told anyone she would "get in big trouble."  J.R. further stated that the defendant made her drink alcohol with apple juice.  She also discussed her observation of the defendant abusing K.M. at the Holiday Motel.  She specifically stated that she saw the defendant put his penis in K.M.'s vagina.  J.R. informed Dr. Atzemis that the last incident of abused occurred when she was ten years old (her age at the time of the interview).

Dr. Atzemis reviewed the hospital's records of prior examinations of J.R. by Dr. Van Nguyen on August 25, 2000, and April 2, 2001.  During the 2000 visit, J.R. made disclosures of penile/vaginal contact with her biological father.  During the 2001 visit, J.R. made disclosures of penile/vaginal contact with the defendant.  During the 2000 examination, it was determined that a portion of J.R.'s hymen (a piece of skin or thin membrane that surrounds the opening of the vaginal wall) was missing at the 6:00 position (near the buttocks, by the anus).  The same condition was observed during the 2001 examination.[FN8]

> [FN8]   While J.R.'s examination resulted in an abnormal finding, Dr. Atzemis stated that it is uncommon to have a physical finding of sexual activity.  According to Dr. Atzemis, an overwhelming majority of child patients with a sexually active history have a normal examination.

Dr. Atzemis's physical examination findings were consistent with the prior findings.  She noted that J.R.'s hymen was now missing from the 4:00 to the 7:00 position.  She stated that the change

in position does not necessarily mean that J.R. had an additional injury. The scar may have grown with the child. Dr. Aztemis referred to the injury as a transection and noted that from a medical standpoint, it is definitive for blunt penetrating trauma sometime in the past. The finding of the more recent examination by Dr. Atzemis did not confirm or deny vaginal penetration during the interim period between examinations.

During cross-examination, it was noted that J.R. reported (during the 2000 visit) that a peer child touched her genitals with his hand. During that visit, J.R. also reported her father put his "private" in K.M.'s. It was also noted that in the 2001 record, J.R. stated that K.M. told her that the defendant "did something" with her. J.R. was not sure what happened to K.M. back then.

During re-direct examination, Dr. Atzemis explained that the skin around the anus and vagina is similar to the skin inside one's mouth in that it is designed to stretch and designed for trauma. Moreover, injuries heal very quickly and things can go past the hole in the hymen into the vaginal vault without leaving any injury because of the stretchiness.

Dana Davis, a clinical social worker and psychotherapist who counseled K.M. and J.R., testified as an expert in the field of counseling and clinical therapy. Davis stated that the two girls had never been counseled together and diligent steps had been taken to keep the girls separate. Davis testified that children commonly delay discussing traumatic events for a number of reasons including fear of the perpetrator or that they will be blamed for the incident. Other reasons for "delayed disclosure" include embarrassment or to protect someone. She confirmed that children often feel affectionate toward perpetrators of abuse, noting that perpetrators often spend a long time building a relationship with the children and making them feel special. Davis also explained that children have a limited ability to understand time and space, noting that they may say "a long time ago" to describe something that happened a week before such description. She also stated that children sometimes minimize the seriousness of trauma.

Davis's first session with J.R. took place on September 22, 2004. Davis diagnosed J.R. with post-traumatic stress syndrome. J.R. exhibited extreme hypervigilance, disassociation (psychological removal after confrontation with disturbing recollections or information), depression and anxiety. Davis noted that disassociation could be a symptom of post-traumatic stress syndrome or a separate diagnosis, dissociative disorder. Davis noted J.R.'s academic delays.

Davis further noted that J.R. has had a very disruptive and labile relationship with her mother.  She explained that the relationship is "changeable" and that J.R. tries very hard to seek the approval of the primary person in her life, her parent.  Davis noted that J.R. has had a very disorganized childhood due to the number of adult people in and out of her life, making it very difficult to establish a primary, trustworthy person. During cross-examination, Davis confirmed that the symptoms noted in J.R.'s diagnosis were associated with varying diagnoses.

State witness D.R., J.R.'s brother, was thirteen years old at the time of the trial.  D.R. was in the seventh grade and taking special-education courses.  D.R. was questioned regarding his observations of the defendant and J.R. while they were in the backseat of Angel's vehicle around Mardi Gras.  As D.R. approached Angel's vehicle, he observed the defendant zipping his pants while J.R. was wiping her mouth.  J.R. was on her knees at the time of D.R.'s observations and the defendant was sitting on the seat.  D.R. stated that the defendant slept in the same bed with J.R. "I think a lot of times."  D.R. also recalled his family spending the night at Donald Rupert's residence.  D.R. slept on the floor in a sleeping bag between the front room and the kitchen.  The defendant and J.R. slept in the same area on an air mattress.  D.R. testified that he heard a repeated noise and concluded that something was causing the air mattress to move.  During cross-examination, D.R. testified that he never actually saw the defendant have sex with his sister.

Defense witnesses, Robert Billiot, Jr. (the defendant's cousin), Terry Kraemer, Sr. (the defendant's father), Stacy Verdin (the defendant's friend), and the defendant's two minor sons, Rosalie Dupre (the defendant's grandmother), and Kem Kraemer (the defendant's mother) testified that they never observed any inappropriate behavior by the defendant regarding children.  Robert Billiot had a seven-year-old daughter at the time of the trial.  The defendant lived with Billiot for about six months and would occasionally take care of his daughter.  Billiot's daughter was about six months old at the time.  Billiot stated that he would still trust the defendant to take care of his daughter.  Stacy Verdin met the defendant at a local club.  They exchanged telephone numbers and became friends.  Verdin had two children at the time of the trial, a daughter and a son.  She testified that her daughter was two years old when she met the defendant.  She further testified that, although her daughter would rarely feel comfortable with outsiders, "for some reason she just took up with him.  She really looked up to him."

Verdin stated that she still trusts the defendant with her kids.  Rosalie Dupre and Kem Kraemer testified that the defendant had a stable, normal childhood.

Defense witness Tiffany Burnett, the defendant's girlfriend, met the defendant in February of 2004, one night when she was out with friends.  She was present and recalled a bowling event with the defendant, K.M., and J.R.  Tiffany testified that K.M. did not appear to be afraid of the defendant and that the group joked and laughed.  Angel eventually joined them.  When they left the bowling alley, the girls chose to ride home with the defendant and Tiffany.  Tiffany testified that she and the defendant never had sexual intercourse.  Although they had tried several times, the defendant was never able to obtain a full erection, so they ultimately stopped trying to have intercourse.  Tiffany had observed the defendant around children on several occasions and never saw him do anything inappropriate with the children.

Tiffany rented a room at the Holiday Motel for the defendant several times.  She stated that the rooms were often registered in her name.  She stated that the first time she rented a room for him, he was looking for a job and did not have money to rent a room.  Tiffany lived with her mother in Thibodaux.  Tiffany confirmed that J.R. and D.R. had occasionally been to her home.  Tiffany also confirmed that the defendant would often baby-sit J.R. and D.R., usually together, but separately on rare occasions.  She and the defendant would often rent a room when they would "go out" and "drink" in Houma.  The Holiday Motel was across the street from an establishment that they frequented.  During cross-examination, Tiffany responded positively when asked whether the defendant was welcome to stay at her home during their relationship.  She stated that the defendant's offshore work was "hit and miss."  She further stated that the defendant would rent a motel room sometimes when he came in from offshore since he did not have a vehicle and could walk to the store for necessities from the motel.  She confirmed that the defendant was alone with J.R. in the motel room on occasion.  Tiffany also testified that the defendant does not wear underwear.

Defense witness, Angel, had two children at the time of the trial, J.R. and D.R.  Angel testified that her children's father, her ex-husband, "raped" J.R. and K.M.  J.R. informed Angel that her father began abusing her when she started dancing at about two years of age.  The abuse was discovered when J.R. was approximately five years of age.  J.R. did not provide her mother with details regarding the abuse.  Angel stated that she had a conversation with K.M. at

some point wherein K.M. stated what J.R.'s father did to her "what he did to [J.R.]," adding that "[h]e put his privates in hers." According to Angel, J.R.'s father was sentenced to forty years imprisonment.

Angel met the defendant in a barroom around September of 2000, and they developed a friendship. The defendant moved in with Angel around October of 2000. Angel stated that their relationship was not romantic although they "slept together" once prior to the defendant moving in with her. The defendant lived with Angel and her children until January of 2001. In October of 2000, the defendant, Shawn, who is K.M.'s mother, and Shawn's ex-husband lived with Angel and her children in their trailer. Shawn's children, including K.M., stayed in the trailer on weekends. Shawn's children stayed with their grandmother, Patricia, during the week. Shawn lived with Angel for several weeks. Thus, K.M. had common living arrangements with the defendant for several weekends in the year 2000. Angel never saw the defendant do anything inappropriate with K.M. or J.R.

In January of 2001, during a counseling session, J.R. made an allegation of sexual abuse by the defendant, but later recanted. Angel reported the allegation to the police. J.R. did not divulge any information to the police. The Office of Child Services (OCS) also investigated J.R.'s claim. The case was validated and Angel was prohibited from having any contact with the defendant.[FN9] The defendant moved out and Angel did not see the defendant again for approximately two years.

> [FN9] Angel confirmed that J.R. also made a claim of alleged abuse against Lawrence Voisin (also known as "Peanut"). According to Angel, the claim was never investigated.

According to Angel, J.R. began exhibiting emotional instability. Angel stated, "[J.R.] would freak out for no reason." J.R. would suddenly begin to cry hysterically at school. J.R.'s therapist suggested that J.R. could be having flashbacks. J.R. also began having seizures. Angel further testified that J.R. was ultimately suicidal and put a knife to her chest on an occasion. J.R. was admitted to the New Orleans Adolescent Hospital (NOAH) for approximately one month. Without any further details, J.R. told Angel that she touched someone sexually while she was at NOAH (during May of 2002). J.R. was admitted to River Oaks Hospital in

New Orleans after another suicide attempt.  She was placed on medication and released after approximately eleven days.  J.R. ultimately informed Angel that the flashbacks and seizures were not real.  Angel stated that she never told J.R. to fake anything. Sometime after the abuse by J.R.'s father, Angel purchased a vibrator for J.R. as a last resort when J.R. started acting out sexually in ways that included an incident of touching a male cousin's "privates" and masturbating with Angel's vibrator and a Barbie doll.  Angel testified that counseling did not appease J.R., so she purchased J.R. the vibrator because she did not want J.R. to hurt herself.  According to Angel, J.R. ceased acting out sexually after she purchased the vibrator for her.  She detailed an incident where J.R. fell asleep using the vibrator.  J.R. woke up when her mother removed the vibrator. According to Angel, she informed J.R. that it was inappropriate for her to sleep with the vibrator between her legs.

In December of 2003, Angel saw the defendant at a bar. Angel and the defendant decided that they needed to talk to each other and they did so.  That same evening, J.R. was awake when Angel arrived home.  Angel asked J.R. if anyone had been touching her and J.R. responded negatively.  She stated, "[a]nd for some reason she brought Terry up that night.  She said that [defendant] hadn't done her anything; that Peanut had tried to touch her."  The next day Angel asked J.R. if she was certain about the statements she made the night before.  J.R. responded positively.  Angel informed J.R. that she saw the defendant, and J.R. stated that she also wanted to see the defendant.  The family rekindled their relationship with the defendant.  Angel testified that she and the defendant became the "best of friends."  She stated that she and her children could depend on the defendant.  The defendant would baby-sit for her at times.  The defendant stayed at the Holiday Motel in 2003, near the week of Christmas and continued to stay there periodically.  Angel rented a room for the defendant on several instances.  The defendant often kept J.R. and D.R. at his motel room during the time period from December of 2003 to September of 2004.  On some occasions, the defendant kept only J.R.

Angel testified that the allegations against defendant made by K.M. and J.R. against the defendant were similar to their allegations against J.R.'s father.  She stated that just after her ex-husband went to prison, K.M. told her that he had sex with her in J.R.'s room on J.R.'s bed and J.R. watched.  Angel confirmed that the defendant and J.R. routinely slept in the same bed.  Angel initially thought this was

inappropriate but J.R. told her she "felt more protected in the same bed with him."

Angel recalled D.R. informing her that on one occasion, he saw defendant zipping his pants as J.R. wiped her mouth.  Angel testified that the defendant "is always making sure his pants are zipped" and J.R. "when she drinks, she wipes her mouth."  Angel also recalled being present during an event at the Holiday Inn.  She specified that it was a birthday party for the defendant's brother.  The defendant, Tiffany, Angel, the defendant's brother and Tiffany [sic], and several children were present for the celebration.  They had one room for the group and the room faced the pool.  The defendant and his brother were drinking alcoholic beverages.  She added, "[a] couple of us had some beer, some wine I believe one was drinking.  Terry went in the room and pretty much passed out."  Angel did not see the defendant go in the room with J.R.  She stated that Tiffany, J.R., and the defendant slept in one bed while she and D.R. slept in the other bed.

While it was not specified as to what incidents the charges stemmed from, Angel was charged with principal to aggravated rape and criminal obstruction.  J.R. and D.R. were removed from her care.  The aggravated rape charge was dropped while the other charge was pending at the time of trial.  The record is unclear as to whether the criminal obstruction charge is related to the instant case.  Angel's credibility was attacked during cross-examination after she was questioned regarding her purchase of a vibrator for J.R.  In a statement to Detective Buquet, Angel stated that she had disposed of the vibrators that she had purchased for herself and for J.R.  However, the vibrators were later confiscated from Angel's mother's house.  Also during cross-examination, Angel confirmed that the defendant had a bad temper and that she was afraid of him at times.  She also stated that J.R. might have also been afraid of the defendant at times.

Consistent with Angel's testimony, the defendant testified that he met Angel in 2000 at a nightclub and they had a "one night stand."  The defendant began staying in a motel room when he was working offshore on Torch barges for ABC Welders.  The defendant did not have anywhere to go in between offshore trips.  The defendant confirmed that he stayed with Angel at the end of 2000 and beginning of 2001, along with K.M.'s parents (with K.M. and her siblings staying with them on the weekends).  After getting injured on the job, the defendant would stay with the Angel's children while she worked.  During the approximate three-month period between late

2000 and early 2001, the defendant saw K.M. during four to six weekend visits.  The defendant became aware of J.R.'s prior abuse by her father after he witnessed an inappropriate incident with J.R. and K.M.'s brother.  According to the defendant, the two children were bouncing on the bed and the defendant left the room.  When he returned, J.R. was under the blanket.  The defendant pulled back the blanket and discovered that J.R.'s outer clothing had been removed.  The defendant discussed the incident with Angel and she informed the defendant of J.R.'s history of abuse.

The police questioned the defendant in January of 2001 as to whether he had any sexual contact with J.R.  The defendant denied any sexual contact with J.R. and stopped answering questions when they became repetitive.   The defendant temporarily moved to Sulphur, Louisiana, to work with his father.  He informed the police of his forwarding address.

After the defendant and Angel resumed their friendship, the defendant had Angel's children with him "on a regular basis on weekends."  The defendant confirmed that he brought K.M. and J.R. to his room at the Holiday Motel in early May of 2004.   The defendant stated that he was alone with the girls in his room for approximately thirty to forty-five minutes.  The defendant stated that he never touched either girl inappropriately.  The defendant also recalled his brother's birthday party at Holiday Inn.  He confirmed sleeping in the same bed with J.R. and Tiffany, but responded negatively when asked if anything happened.  When asked if he recalled the Mardi Gras event described in prior testimony, the defendant stated he remembered going with Angel to purchase "beads or balls or something."  He stated that he did not do anything inappropriate with J.R. on that occasion.  The defendant also recalled the nights they slept at Donald Rupert's house.  The defendant stated that he had plans to move out of the motel and move in with Rupert.  Angel was supposed to pay for the first month's rent but did not have the money.  During the "couple of days" that they spent at Rupert's house, the defendant explained that "something happened that kind of ticked [him] off" (as discussed below, further explanation was sought and given during cross-examination).   The defendant confirmed that he slept on an air mattress with J.R. during the brief stay there.  The defendant further confirmed that D.R. slept in the same room.  He stated that he did not have sex with J.R.  The defendant testified that he did not have a birthmark or a mole on his penis.  Photographs of the defendant's genitals were admitted into

evidence.  The defendant did not wear a watch, but did have two scars on his face below his eyes.

During cross-examination, the defendant speculated that J.R. made the claim against him to get attention.  The defendant stated that the incident where J.R.'s outer clothes were removed while she was in the room with K.M.'s brother was the only inappropriate incident he witnessed.  The State impeached the defendant by quoting his prior statement to OCS in January 2001, in which the defendant stated, "One morning [J.R.] ... woke [him] up because she was jacking [him] off."  The defendant testified that the incident did occur but it "slipped [his] mind."

When further questioned regarding the Mardi Gras incident, the defendant confirmed that he stayed in the vehicle when Angel went to purchase Mardi Gras items.  The defendant instructed D.R. to bring Angel her telephone when she received a call.  The defendant and J.R. were alone in the vehicle until D.R. returned. Regarding the stay with Donald Rupert, the defendant explained that Rupert "kind of ticked me off" when he was "playing around with the kids, and he was saying how fat they got.  He grabbed [D.R.'s] tit and he turned around and grab [sic] at [J.R.'s]."

The defendant responded positively when asked whether he carried a sexual lubricant with him during the time he dated Tiffany. When asked whether he had a sexual relationship with Tiffany, the defendant stated that they "[t]ried, but we didn't, couldn't."  The defendant confirmed that he did not use the lubricant with Tiffany and stated that he had it in his bag "a long time before everybody else went around, too."

Rebuttal State witness, Donald Rupert, corroborated the defendant, J.R., and her family stayed briefly in his home.  Rupert stated that he had "some words with the [d]efendant" pertaining to his sleeping arrangements with J.R.  Rupert testified, "I told him it wasn't going to go down in my house."  He explained that the defendant and J.R. shared the same bed.  On cross-examination, Rupert confirmed that the defendant and J.R. had clothes on during his observations.

Shirley Billiot knew the defendant, and was present one night when the defendant and J.R. visited Billiot's sister.  She stated that their behavior made her uncomfortable.  She specified that J.R. would get upset when the defendant talked to someone else.  She further stated that their relationship appeared to be a "girlfriend/boyfriend friendship."  Billiot sat on the defendant's lap at one point and J.R. got very upset with her.  The defendant explained to her that J.R.

"didn't look at him as a friend, more of a boyfriend/girlfriend situation." During cross-examination it was noted that Billiot did not include the defendant's comments in her statement to the police. Her statement did, however, include her observations of J.R.'s behavior.

Tallula Cantrelle, Billiot's sister, also testified. Regarding an occasion when the defendant and J.R. interacted at her home, she stated, "it's just the way like [*sic*] she was hanging on him and, you know, like she was always by him, just didn't – didn't look right to me." She also noted that J.R. got angry when Billiot sat on defendant's lap. Cantrelle relayed her concerns to Angel near the end of 2003.

J.R. was the final rebuttal witness. J.R. testified that her mother used the sexual device (vibrator) on her on one occasion. She also stated that her mother told her not to tell the truth in court. During cross-examination, J.R. denied using toys or her mother's device to touch herself. On re-direct examination, J.R. reiterated that she was telling the truth about her claims against her biological father, against Peanut, and against the defendant.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. State v. Taylor, 97-2261, pp. 5-6 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell, 99-3342, p. 8 (La. 10/17/00), 772 So.2d 78, 83.

The defendant argues that the verdict herein is irrational and that the victim's testimony was incredible and inconsistent. We disagree. Although the defendant hypothesizes that the victims are confusing him with their prior abuser, J.R.'s father, the defendant does not deny bringing the girls to the motel room and, in particular, being alone with J.R. in a motel room and routinely sleeping in the same bed with J.R. at different locations. The defendant admitted that J.R. masturbated him on one occasion. D.R.'s observations were consistent with J.R.'s factual claims regarding the Mardi Gras incident and the abuse that occurred at Donald Rupert's home. The victim convincingly and consistently rehashed several instances of sexual abuse by the defendant. The jury was reasonable in rejecting

the defendant's hypothesis of innocence.  After a thorough review of the record, viewing the evidence in the light most favorable to the State, we are convinced that any rational trier of fact could have found that the evidence, to the exclusion of every reasonable hypothesis of innocence, was sufficient to prove all of the elements of aggravated rape of J.R.  This assignment of error is without merit.[14]

Because sufficiency of the evidence claims present a mixed question of law and fact, this Court must defer to the state court's decisions rejecting petitioner's claims unless he shows that the decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that petitioner has made no such showing in this proceeding.

As correctly noted by the state courts, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).  Moreover, Louisiana's

---

[14]  State v. Kraemer, No. 2006 KA 2121, at pp. 4-23 (La. App. 1st Cir. May 4, 2007); State Rec., Vol. VI of VI.

circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011), cert. denied, 132 S.Ct. 1713 (2012); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010).

Here, the elements of the crimes were clearly established through the testimony of the victims.  In fact, although their testimony was corroborated by other witnesses, the victims' testimony alone would have been constitutionally sufficient to support the instant convictions. Peters v. Whitley, 942 F.2d 937, 941-42 (5th Cir. 1991); see also Fetterley v. Whitley, No. 94-30310, 1994 WL 708655, at *1 n.6 (5th Cir. Dec.  6, 1994); Crumholt v. Cain, Civ. Action No. 11-2543, 2011 WL 6329934, at *8 (E.D. La. Nov. 29, 2011), adopted, 2011 WL 6329868 (E.D. La. Dec. 19, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *26 (E.D. La. Oct. 29, 2009).  Moreover, although petitioner disputes the victims' credibility, witness credibility is an issue for the jury, not a federal *habeas* court.  Where a petitioner's insufficient evidence claim is based on the credibility of a witness, a federal *habeas* court generally will not grant relief.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson [v. Virginia, 443 U.S. 307 (1979)], the

– 36 –

assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the Jackson standard for habeas relief."); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

       For the reasons noted by the state court, the evidence presented in the instant case, viewed in the light most favorable to the prosecution, was clearly sufficient for any rational trier of fact to find petitioner guilty beyond a reasonable doubt. Therefore, he cannot show that the state court decisions rejecting these claims were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, this Court should defer to those decisions.

## B. Improper Opening Statement

       Petitioner next claims that his rights were violated when the prosecutor, in his opening statement, "erroneously instructed the jury on law and gave personal opinion."[15] In the last reasoned state court opinion addressing that claim, the state district denied the claim, holding:

> [T]he defendant alleges he was denied due process when the prosecutor in his opening statement erroneously instructed the jury on the law and expressed his personal opinion about the defendant. The defendant has pointed to the following statement made by the prosecutor to the jury in his opening statement:

---

[15] Rec. Doc. 3, p. 31.

"Now, the opening statement that I'm doing and the defendant will do in this case, as the Judge told you is not evidence, it's merely a road map of where I think the evidence will take us that we're going to see in this case, and as we go through the investigation."

"I want to caution you.  If you hear the evidence different than how I relate it, I can assure you I don't mean to relate it incorrectly.  But I want you to rely on your own recollection and interpretation of the evidence, not mine.  Okay? I think I'll lay it out fairly clearly and succinctly for you, but keep in mind, you are to rely on your own, not mine."

"By the same token, if you hear the evidence differently interpreted differently than how the Defendant lays it out, by the same token, I want you to disregard what the Defendant says and rely on your own recollection and your own interpretation.  That's what the law requires.  Okay?"

(Trial Transcript, Volume II, page 10, line 27 to page 11, line 15)

According to Mr. Kraemer, the statements quoted above were objectionable because they constituted an erroneous and improper instruction to the jury.  He alleges the statement by the prosecutor was an instruction to the jury "that it was correct for them to interpret as they saw fit, not as the law says," and that they were to disregard anything the defense says."

The defendant's characterization of the prosecutor's statements is wrong.  First, the prosecutor did not tell the jury to disregard anything the defense said.  He told the jury that "if you hear the evidence differently interpreted differently than how the Defendant lays it out, by the same token, I want you to disregard what the Defendant says and rely on your own recollection and your own interpretation."  Although awkwardly stated, the prosecutor merely, and correctly, reminded the jurors that their verdict would have to be based on their view of the evidence after hearing from both sides.

Further, the prosecutor did not by the above-quoted statements instruct the jury that it could come to whatever

– 38 –

conclusions it chose to come to in disregard of the law.  He simply reminded the jury that the law required that it weigh all the evidence, including any evidence produced by the defendant, and come to its own conclusions.

The defendant also alleges the following statement made to the jury by the prosecutor was improper:

> "Now, when he came back – I'm going to talk about Kayla first, and then we'll talk a little bit about Jena. When he came back, he spent a lot of time with Jena. That was his habit.  And he did a lot of things just the two of them ...."

> (Trial Transcript, Volume II, page 16, lines 20 to 24)

The names mentioned by the prosecutor in this statement were the names of the two female juveniles raped by the defendant.  Mr. Kraemer alleges the prosecutor's remark regarding the defendant's "habit" of spending "a lot of time with Jena," one of the victims, amounted to an improper assertion of opinion by the prosecutor because the evidence later in trial did not support the allegation.

Whether or not the defendant was in the "habit" of spending "a lot of time with Jena," and the weight or value to be given a fact, were matters for the jury to determine based on the evidence made available to it during the trial.  There was evidence offered upon which such a conclusion could have been reasonably based.  In any event, under article 766 of the Louisiana Code of Criminal Procedure, the state is obligated to "set forth, in general terms, the nature of the evidence by which the state expects to prove the charge."  The failure of the state to produce the evidence promised does not render its representations to jury prior to the production of the evidence improper nor does it deny a defendant a fair trial.  To the contrary, in all likelihood the failure of the state to come forward with promised evidence inures to the benefit of the defendant.

With regard to the defendant's complaints about the prosecutor's opening statement, the court notes that on more than one occasion it instructed the jury that the opening statements by the state and the defendant were not evidence and should not be considered as evidence.  (Trial Transcript, Volume II, page 5, lines 18 to 26; Trial Transcript, Volume II, page 46, lines 20 to 26; Trial Transcript, Volume V, page 86, lines 12 to 14).

> For the foregoing reasons, post conviction relief will not be
> granted based on defendant's first claim.[16]

For the reasons so accurately explained by the state court, this claim clearly has no

merit.  The prosecutor's statements concerning the law were neither incorrect nor misleading, and

his comments concerning the facts were a permissible commentary on what he expected to prove,

and in fact ultimately *did* prove, at trial.  Moreover, even if this were a close call, which it is not, the

proper instructions concerning the limited extent to which the jury could consider the opening

statements were more than sufficient to protect petitioner's right to a fair trial.  Accordingly, the

state court's decision rejecting this claim was not unreasonable or contrary to clearly established

federal law, and, under the strict and narrow standards of review mandated by the AEDPA, is

entitled to deference by this Court.

### C.  Improper Closing Argument

Petitioner further claims that his rights were violated when the prosecutor, in his

closing argument, "vouched for witnesses, gave expert testimony and attacked Kraemer's

character."[17]  In the last reasoned state court opinion addressing that claim, the state district denied

the claim, holding:

> Mr. Kraemer alleges he was denied the due process guarantee of a
> fair trial because during his closing argument the prosecutor vouched
> for witnesses, gave expert testimony, and attacked the defendant's
> character.  With regard to his allegation that the state "vouched for
> the credibility of Kayla before the jury and the Court," the defendant
> points to the following excerpt from the state's closing argument:

---

[16]  State Rec., Vol. II of VI, Reasons for Judgment dated August 27, 2011, at pp. 3-5.

[17]  Rec. Doc. 3, p. 45.

"Now, I think Kayla took the only path that she could take if she stayed to the truth.  It was a scary path, it was a path that was unknown to her – unknown to most people, but certainly unknown to her.  And this was a very difficult path for her to take to come into here, a little eleven year old girl, and talk about what happened – very intimate details about what happened to her to, you know, a courtroom full of strangers.  She suffered through that for only one reason; she was telling us the truth.  She didn't suffer through that for a lie."

(Trial Transcript, Volume V, page 16, lines 3-13).

The defendant also alleges the state improperly vouched for the credibility of Jena when the prosecutor told the jury during closing arguments:

"A lot has been made about the fact that Jena said something to her mother about what happened in 2001, and then later didn't say anything.  Or later – actually, what they make a deal out of is she said it didn't happen.  She told her mama it didn't happen repeatedly, and then the defense said in opening statement that she told Detective Tullis it didn't happen when Detective Tullis talked to her.  We know that's not true."

(Trial Transcript, Volume V, page 18, lines 24-32).

"But she's embarrassed to tell us that she was made to put her arms around the Defendant and pinch his nipples while he's having – he was having sex with her friend.  Does that sound like a fabrication?  It doesn't to me."

(Trial Transcript, Volume 5, page 21, lines 1-5).

The defendant cites a third example from the state's closing argument to support his claim that the state improperly vouched for the credibility of witnesses, this time with regard to a witness called by the state, Drew, the thirteenth year old brother of Jena:

"Then we have Drew.  Drew is thirteen years old, very straight forward kid.  That's the only way he knows to be.  Drew is not capable of concocting anything."

(Trial Transcript, Volume V, page 23, lines 17-20).

The defendant also takes issue with the prosecutor's statement in his closing argument with regard to the testimony of Dr. Atzemis, which statements he claims improperly vouched for the credibility of Dr. Atzemis:

"Same was true in Jena's exam except she had a 6:00 – what she called a transection.  And she explained that was a missing – a little missing piece of her hymen at the 6:00 position that she described to us. I thought – and I wouldn't have spent that much time questioning her, but I thought when I looked at the medical evidence and I saw the old exam that said a 6:00 transection, and the new exam that says a transection from 4:00 to 7:00, I said, hmm, there's been a change.  Maybe that's significant.  She tells us it's not, and it's not significant.  Why?  You just can't tell by a physical exam on finding whether or not necessarily a particular event happened.  You can just look and see what the finding is there.  And she says, look, most of the time the abnormal finding – and certainly I couldn't, you know – I'm not going to differentiate between the old finding and this finding. She told us the truth.  I was wrong.  Okay?"

(Trial Transcript, Volume V, page 26, line 20 to page 27, line 8).

It is improper for the prosecutor to vouch for or assert his personal opinion of the credibility of a witness when doing so implies that the prosecutor has additional knowledge or information about the case which has not been disclosed to the jury.  State v. Smith, 554 So.2d 676 (La., 1989).

The court has carefully reviewed all the allegations of the defendant with regard to his claim that the prosecutor improperly vouched for the credibility of four witnesses in his closing argument.

In none of the instances cited by the defendant did the prosecutor suggest that he had additional knowledge or information about the case which had not been disclosed to the jury.  As required by Louisiana Code of Criminal Procedure article 774, the prosecutor's various arguments quoted were "confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state ... may draw therefrom, and to the law applicable to the case."

Mr. Kramer further claims the state's closing argument was improper in that the prosecutor told the jury the following:

> "Pedophiles by definition are attracted to pubescent children.  Sometimes they can't have an erection with an adult female."

This statement by the prosecutor was preceded by statements to the jury that went into the evidence about the difficulty the defendant had in engaging in sex with his girlfriend, and was followed by statements emphasizing to the jury that they should focus their attention on what happened to the victims in this case and not the relationship between the defendant and his girlfriend.

The court believes the statement quoted above was improper. There was no evidence offered to the jury to establish the meaning of the term or the characteristics common to pedophiles, and it is not likely that any such evidence would have been admitted.  The statement was an improper appeal to the prejudices of the jurors.

However, the court does not believe the making of the statement by the prosecutor in closing arguments denied the defendant a fair trial.  It was obvious to the jury that the defendant was accused of raping two children.   In addition, the court specifically instructed the jury as follows:

> "You must decide this case in an impartial manner based upon the evidence presented and nothing else. You cannot decide this case based upon prejudice or passion or sympathy, or any motive whatsoever except a fair and impartial consideration of the evidence."

(<u>Trial Transcript</u>, Volume V, page 84, lines 7-13).

In sum, the court believes this error by the prosecutor was harmless and that the defendant, as a result thereof, was not deprived of a fair trial, i.e., a trial that results in a verdict worthy of confidence.

Finally, the defendant complains of the following argument made to the jury by the prosecutor with regard to the defendant's testimony at trial:

> "He lied to us about why he had to leave the Rupert house. He put it on Donald Rupert. He has a tendency to do that. Place blame on others. Donald Rupert told us the truth about what happened. He saw him and Jena sleeping together and braced him about it, and said, now that's wrong, and it's not going to happen in my house. And what did he say? The next day he was gone. That's not the only lie."

(Trial Transcript, Volume V, p. 30, lines 5 to 13).

The defendant alleges the above quoted argument by the state was improper as an attack on the defendant's character and implied that the prosecutor had knowledge about the character of the defendant. The court finds, based on its review of all the pertinent testimony reflected by the record, that the prosecutor did not suggest that he had additional knowledge or information about the case which had not been previously disclosed to the jury. Further, while it is true the prosecutor attacked the defendant as a liar, this attack was permitted inasmuch as the attack was confined to the defendant's testimony at trial.

For the foregoing reasons, all of the defendant's complaints reflected by his ... claim cannot serve as a basis for post conviction relief.[18]

Petitioner's contention that the prosecutor improperly vouched for the credibility of his witnesses clearly has no merit. As the state court correctly noted, it is improper for a prosecutor to vouch for the credibility of a witness or to express an opinion as to the defendant's guilt *if* there is underlying an implication that the prosecutor's statements are based on additional personal

---

[18] State Rec., Vol. II of VI, Reasons for Judgment dated August 27, 2011, at pp. 7-10.

knowledge about the witness or the facts of the case that are in not in evidence.  See, e.g., United States v. Munoz, 150 F.3d 401, 414-15 (5th Cir. 1998); Richthofen v. Cain, Civ. Action No. 05-5701, 2008 WL 630477, at *49 n.81 (E.D. La. Mar. 7, 2008); Spicer v. Cain, Civ. Action No. 07-3770, 2007 WL 4532221, at *9 (E.D. La. Dec. 19, 2007).   However, such comments are not necessarily improper where it is apparent to the jury that the comments are based on the evidence presented at trial rather than on personal knowledge of facts outside the record.  See, e.g., Nichols v. Scott, 69 F.3d 1255, 1282-83 (5th Cir. 1995); Richthofen, 2008 WL 630477, at *49 n.81; Spicer, 2007 WL 4532221, at *9.  In the instant case, when the comments in question are reviewed in context and in their entirety, it is evident that the prosecutor's statements were not inappropriate but rather were permissible commentary concerning the evidence at trial.  Accordingly, the state court's decision rejecting this claim was not unreasonable or contrary to clearly established federal law, and, therefore, is entitled to deference by this Court.

        The same is true of the state court's rejection of the claim that the prosecutor improperly attacked petitioner's character by essentially calling him a liar, because "it is proper for a prosecutor to refer to the defendant's dishonesty when such a characterization is reasonably seen as drawing conclusions from, and is actually supported by, the evidence."  United States v. Bush, 451 Fed. App'x 445, 451 (5th Cir. 2011); see also United States v. Turner, 651 F.3d 743, 752 (7th Cir.) ("A comment on the defendant's credibility that is supported by the evidence is a hard blow, but a fair one.  Where the character and credibility of the defendant are at issue and the evidence allows the inference that the defendant has been less than truthful, the prosecutor does not err in closing argument by referring to the defendant as a liar." (internal quotation marks omitted)), cert.

denied, 132 S.Ct. 863 (2011); Bland v. Simmons, 459 F.3d 999, 1025 (10th Cir. 2006) ("Although labeling a defendant a 'liar' is often 'unnecessary' and 'unwarranted,' we have held that referring to testimony as a lie is not *per se* prosecutorial misconduct. On the contrary, it is permissible for the prosecution to comment on the veracity of a defendant's story." (citations omitted)).

Finally, like the state court, this Court finds the prosecutor's comments regarding pedophelia improper because they were not based on the evidence presented at trial. However, as the state court correctly noted, that does not mean that petitioner is entitled to relief. On the contrary, the United States Fifth Circuit Court of Appeals has held:

> Even if ... [a] prosecutor's remarks [are] improper, prosecutorial remarks are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair. Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.

Harris v. Cockrell, 313 F.3d 238, 245 (5th Cir. 2002) (internal quotation marks, ellipsis, and footnote omitted); see also Jones v. Butler, 864 F.2d 348 (5th Cir. 1989). In other words, a prosecutor's remarks warrant *habeas* relief only if they were "a crucial, critical, highly significant factor upon which the jury based its verdict." Harris, 313 F.3d at 245. In the instant case, the prosecutor's comments were not "persistent and pronounced" and evidence of petitioner's guilt was far from insubstantial. Accordingly, again, the state court's decision rejecting this claim is entitled to deference under the AEDPA because it simply was not unreasonable or contrary to clearly established federal law.

D.  Ineffective Assistance of Counsel

Petitioner also claims that he received ineffective assistance of counsel at trial.  In Strickland v. Washington, 466 U.S. 668, 697 (1984), the United States Supreme Court established a two-prong test for evaluating such claims.  Under that test, a petitioner must demonstrate both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Id. at 697.  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v.

McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

   In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

   Because an ineffective assistance of counsel claim is a mixed question of law and fact, this Court must defer to the state court decision denying such a claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

    The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be

granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 785-86 (2011) (citation omitted). The Supreme Court then

explained:

Surmounting <u>Strickland</u>'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness

– 49 –

under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 788 (citations omitted; emphasis added).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted in the instant case with respect to petitioner's ineffective assistance of counsel claims.

In addressing petitioner's ineffective assistance of counsel claims, the state district court, in the last reasoned state court opinion addressing the claims, first correctly noted:

> After reviewing the allegations of the defendant in his application for post conviction relief, the answer of the state thereto, and the entire record of the proceedings in this court, an evidentiary hearing was ordered by the court.  That hearing was held August 25, 2011, and the evidence was presented by the defendant who was represented by counsel.  That evidence consisted of the testimony of the defendant Mr. Kraemer.
>
> Claims of ineffective assistance are reviewed under the two-part test of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.ED2d 674 (1984).  In order to prevail, the defendant must show both that (1) counsel's performance was deficient and (2) he was prejudiced by the deficiency.  With regard to the second element, i.e., prejudice, the defendant must show that any error was so serious as to deprive him of a fair trial or other proceeding.  To carry this burden, the defendant must show that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[19]

The state district court then proceeded to address each of petitioner's claims individually, and this Court will do the same.

As to the first ineffective assistance claim, the state district court held:

---

[19]  State Rec., Vol. II of VI, Reasons for Judgment dated August 27, 2011, at pp. 2-3.

> [T]he defendant alleges ineffective assistance of counsel because his trial counsel failed to object to the statements made by the prosecutor during his opening statement and described hereinabove with reference to his first assignment of error. As previously explained, the statements made by the prosecutor and pointed out by the defendant were not improper. As a result, any failure of trial counsel to object to the same was not error on his part. This assignment of error is without merit.[20]

As the state court correctly held, the prosecutor's opening statement was not improper for the reasons previously explained. Therefore, any objection would have been frivolous, and it is clear that counsel is not ineffective for failing to lodge meritless objections. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."). Accordingly, this claim should be rejected.

As to petitioner's second ineffective assistance claim, the state district court held:

> [T]he defendant complains that his trial counsel was ineffective because he failed to present expert testimony to refute the state's evidence. More particularly, the defendant alleges as follows:
>
> > "Petitioner contends that his trial counsel was constitutionally ineffective for failing to obtain expert witnesses for the defense. The State produced expert witnesses that could have been refuted with a qualified expert concerning the alleged victims. As it stood, the trial was a one-sided affair."

---

[20] State Rec., Vol. II of VI, Reasons for Judgment dated August 27, 2011, at p. 5.

The defendant points out that two expert witnesses testified for the state at his trial, Dr. Ellie Wetsman and Dr. Adrienne Atzemis, who were both pediatricians.  Mr. Kraemer notes that Dr. Wetsman testified that her physical examination of one victim, Kayla, on October 19, 2004, was normal, despite allegations that the ten year old child had been vaginally raped by the defendant months before.  (Trial Transcript, Volume III, page 7, line 23 to page 14, line 8).  Dr. Wetsman explained that it is rare to discover physical findings of rape on examination of a victim long after the incident.  (Trial Transcript, Volume III, page 14, lines 16-22).  On cross-examination, she stated that from her physical examination of the victim, she could not tell whether Kayla had ever engaged in sexual activity.  (Trial Transcript, Volume III, page 21, lines 18-19).

Dr. Adrienne Atzemis examined Jena, another victim in this case, on April 25, 2005, when the child was ten years old, approximately ten months after the last time the defendant was accused of raping the child.  Dr. Atzemis reported only one significant physical finding, i.e., that a small portion of the child's hymen was missing.  She noted, however, that this finding, known as a transection, had been consistently reported after previous examinations going back five years.  (Trial Transcript, Volume III, page 39, lines 1-22).  Dr. Atzemis pointed out to the jury that the findings from Jena's vaginal examination in 2000 were made after Jena "gave a clear and detailed history of chronic penile/vaginal penetration by her father, Lynn ...."  (Trial Transcript, Volume III, page 49, lines 28 to page 50, line 3).  Although Dr. Atzemis confirmed that a transection of the hymen is definitive for blunt penetrating trauma, she was equally adamant in declaring that her finding did not deny or confirm vaginal penetration since the transection was first noted five years previously.  (Trial Transcript, Volume III, page 43, lines 1-23).

Mr. Kraemer, in effect, argues that defense counsel should have produced medical testimony to explain to the jury that the absence of physical findings by the children's' [sic] examining physicians meant that children were not sexually penetrated.  According to Mr. Kraemer, the testimony of Dr. Wetsman and Dr. Atzemis "could have been refuted."   In his post conviction application, Mr. Kraemer did not point the court to any evidence that the testimony of Dr. Wetsman and Dr. Atzemis was incorrect or that anyone in the medical community disagrees with their opinions.  At the hearing in this matter on August 25, 2011, no evidence was offered, or even suggested, to contradict the opinions given at trial by

the state's expert physicians.  In the absence of such evidence, under <u>Strickland</u>, *supra*, the court cannot say trial counsel's performance was deficient for failure to offer the expert testimony merely suggested by the defendant.  As a result, the defendant's ... claim is without merit.[21]

As correctly noted by the state court, this claim fails because petitioner has not met his burden of proof.  As the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice *by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.*  This requirement applies to both uncalled lay *and expert witnesses.*

<u>Woodfox v. Cain</u>, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted; emphasis added); <u>see also</u> <u>Day v. Quarterman</u>, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Here, petitioner has produced no evidence whatsoever, such as affidavits from any experts, demonstrating that they would have testified in a manner beneficial to the defense.  Therefore, he clearly has not met his burden with respect to this claim.  <u>See, e.g.,</u> <u>United States v.</u>

---

[21]  State Rec., Vol. II of VI, Reasons for Judgment dated August 27, 2011, at pp. 5-7.

Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance."). Accordingly, this claim should likewise be rejected.

As to petitioner's final ineffective assistance claim, the state district court held:

The fifth and final post conviction claim for relief by the defendant is based on his assertion that his trial counsel was ineffective because trial counsel failed to object when, during his closing argument, the prosecutor vouched for witnesses, gave expert testimony, and attacked the defendant's character, all as described hereinabove with regard to the defendant's fourth claim for post conviction relief.  To the extent the statements made by the prosecutor and pointed out by the defendant were not improper, as explained above, any failure of trial counsel to object to the same was not an error on his part.

The only statement found improper by the court was the statement made by the prosecutor by which he implied the defendant was a pedophile.  Even assuming trial counsel's performance was deficient for failing to object to the statement, for the reasons

– 54 –

> explained above the court does not believe the defendant was
> prejudiced by the deficiency, i.e., that the error was so serious as to
> deprive him of a fair trial.   This assignment of error is without
> merit.[22]

Again, that decision is entitled to deference because it is neither contrary to nor an unreasonable application of clearly established federal law.  For the reasons previously explained, the prosecutor did not improperly vouch for the credibility of his witnesses or impermissibly attack the defendant's character.  Therefore, any objection to the comments on those bases would have been frivolous, and, as noted above, counsel is not ineffective for failing to lodge meritless objections.  Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).  Moreover, even if counsel should have objected to the prosecutor's comments regarding the characteristics of pedophiles and could be considered to have performed deficiently for failing to do so, petitioner is not entitled to relief based on that lapse because he cannot establish the prejudice required under Strickland.  Petitioner's conviction turned on the wrenching testimony of the young children he raped, not on this passing comment of the prosecutor.  Therefore, even if counsel had objected to the comment and the error been corrected, there is no reasonable probability that the result of the proceeding would have been different.

In summary, petitioner has failed to demonstrate that the state court's decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United

---

[22]  State Rec., Vol. II of VI, Reasons for Judgment dated August 27, 2011, at pp. 10-11.

States.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

### RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the federal petition for *habeas corpus* relief filed by Terry Kraemer be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[23]

New Orleans, Louisiana, this twenty-first day of February, 2013.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[23] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.